IN THE UNITED STATES DISTRICT COURT
FOR THE DIVISION OF SOUTH CAROLINA
ANDERSON DIVISION
C.A. No.: 8:12cv2365-TMC

| | | |
|---|---|---|
| Starr-Iva Water and Sewer District, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | AFFIDAVIT OF |
| | ) | JOHN R. MOORE, JR. |
| City of Anderson, a Municipality, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |

PERSONALLY APPEARED BEFORE ME, John R. Moore, Jr., who, being duly sworn, states as follows:

1.    I am a resident of Anderson County, South Carolina. I currently serve as the City Manager for the City of Anderson (the "City") and have held this position since 1991.

2.    In late 2001 and early 2002, I participated in the negotiations by which the City acquired certain retail assets of Duke Energy Corporation ("Duke") and became a member of the Anderson County Joint Municipal Water System, now called the Anderson Regional Joint Water System ("ARJWS").

3.    On February 20, 2002, the Starr-Iva Water and Sewer District (the "District") and other water districts entered into a Second Amendment to Purchase Agreement with Duke. In the amended agreement, the District expressly approved Duke selling "the retail portion of the water system to the City of Anderson, South Carolina." Included in the amended agreement with Duke is a "Service Area Boundary Description" and map outlining the City's service area, which encompassed the sites on which the

industrial facilities of BASF and Owens-Corning were at that time located. The Service Area Boundary Description specifically included "all of the Owens Corning Fiber Plant property" and "the BASF Plant property." A true and correct copy of excerpts from the Second Amendment to Asset Purchase Agreement, including the Service Area Boundary Description and map, is attached hereto as Exhibit A and incorporated herein by reference. The industrial sites of BASF and Owens-Corning have been highlighted on the map.

4.    On February 20, 2002, the City entered into an Asset Sale Agreement with Duke whereby it purchased transmission lines, storage tanks, and related facilities generally comprising Duke's retail water system. Included in the City's agreement with Duke is a "Service Area Boundary Description" and map outlining the City's service area, which specifically included "all of the Owens Corning Fiber Plant property" and "the BASF Plant property." A true and correct copy of excerpts from the Asset Sale Agreement, including the Service Area Boundary Description and map, is attached hereto as Exhibit B and incorporated herein by reference. The industrial sites of BASF and Owens-Corning have been highlighted on the map.

5.    As part of the City's purchase, Duke assigned to the City the Water Service Agreements between Duke and BASF and between Duke and Owens-Corning.

6.    On March 21, 2001, the City, the District, the AJRWS, and other members of the AJRWS entered into a Water Sale and Purchase Agreement (the "Agreement").

7.    Under the terms of the Agreement, each member of the AJRWS agreed to purchase water from the AJRWS to provide potable water service to customers located within its defined service area. "In order to successfully plan and finance additions to

each Purchaser's System, and to avoid future disputes ...," the parties to the Agreement "agreed upon a Territorial Map of the territories of the parties to this Agreement in order to set out the areas each intends to serve."

8.     As shown by the Territorial Map, the service area assigned to the City includes the sites on which the industrial facilities of Owens-Corning and BASF were located. A true and correct copy of excerpts from the Agreement, including a color copy of the Territorial Map, is attached hereto as Exhibit C and incorporated herein by reference.

9.     As part of the Agreement, the District expressly consented to the City providing potable water and related services to "two industries, BASF and Owens-Corning, located within the boundaries of Starr-Iva Water and Sewer District."

10.     It is my understanding that the ownership of the BASF property was transferred to Honeywell Nylon in 2003 and to Shaw Industries in 2005. The City has provided potable water and related services to the industries located on those sites continuously since 2002.

11.     During the period from February 21, 2002 to the present, the City reasonably relied on the District's express consent when the City incurred significant costs and expenses of approximately $5 million to (a) acquire the necessary infrastructure to serve the BASF and Owens-Corning sites from Duke, (b) purchase potable water capacity to serve the sites from AJRWS, and (c) upgrade the existing water system to serve the sites.

12.    In 2010, a major industrial prospect (later identified as First Quality)
became interested in one of the disputed sites, the BASF site, at which the previous
industries had closed.

13.    Based upon my understanding of the Agreement, the City is entitled to
provide potable water and related services to First Quality, as it is located entirely within
the property commonly referred to as the "BASF site," which is clearly described in the
property descriptions contained in the various agreements and the maps attached thereto
as being in the City's service area.

FURTHER AFFIANT SAYETH NOT.

John R. Moore, Jr.

Sworn to before me this 25th
day of June, 2012.

Notary Public for South Carolina
My Commission Expires: 10/6/19

# EXHIBIT A



## SECOND AMENDMENT TO ASSET PURCHASE AGREEMENT

THIS SECOND AMENDMENT TO ASSET PURCHASE AGREEMENT, dated as of the 20th day of February, 2002 (this "Amendment"), is between Duke Energy Corporation, a North Carolina corporation (the "Seller"), Anderson County Joint Municipal Water System, a public body corporate and politic of the State of South Carolina (the "Purchaser"), and the following members of the Purchaser (the "Members"): Big Creek Water and Sewerage District and Broadway Water and Sewerage District, each of which is a public body corporate and politic of the State of South Carolina; and Hammond Water District (formerly, Hammond Water Company); Powdersville Water District (formerly, Powdersville Water Company); Sandy Springs Water District (formerly, Sandy Springs Water Company); Starr-Iva Water and Sewer District (formerly Starr-Iva Water Company); and West Anderson Water District (formerly, West Anderson Water Company), each of which is a public body corporate and politic of the State of South Carolina that was formerly a South Carolina non-profit corporation. This Amendment amends the Asset Purchase Agreement (the "Purchase Agreement"), dated as of February 14, 2000, between the Seller and the Members, as amended by the First Amendment to Asset Purchase Agreement dated August 1, 2001 (the "First Amendment").

### BACKGROUND STATEMENT

Pursuant to the Purchase Agreement, the Purchaser agreed to purchase from the Seller, and the Seller agreed to sell to the Purchaser, the Seller's water system in Anderson County, South Carolina, through a purchase and sale of substantially all of the system's assets. The parties have agreed to amend the Purchase Agreement to sell the wholesale portion of the water system to the Purchaser and to sell the retail portion of the water system to the City of Anderson, South Carolina.

The Purchaser, the Members and the Seller desire to amend the Purchase Agreement as provided herein.

### STATEMENT OF AGREEMENT

NOW, THEREFORE, the parties hereto agree as follows:

### ARTICLE I

### DEFINITIONS

1.1    Capitalized Terms.  Capitalized terms used herein without definition shall have the meanings given to them in the Purchase Agreement.

CH31079v12_03227 0:092

08.25.12 City 000128

5000170

## ARTICLE II

### AMENDMENTS

2.1     Purchase Price. Section 3.1 of the Purchase Agreement is hereby amended to reduce the Base Purchase Price from $68,000,000 to $47,870,000.

2.2     Conveyance to City of Anderson. The Purchaser acknowledges that the Seller intends to enter into an asset sale agreement dated as of the date hereof (the "Anderson Sale Agreement") with the City of Anderson ("Anderson") to convey directly to Anderson those Assets described on Exhibit A attached hereto (the "Retail Assets") for a purchase price of $15,580,000. In addition, the Purchaser acknowledges that (i) the Anderson Sale Agreement contains a provision under which Anderson may request that the Seller purchase for Anderson's benefit certain vehicles (the "Retail Vehicles") that Seller currently leases for use in connection with the Retail Assets and (ii) upon such purchase the Retail Vehicles shall constitute "Retail Assets." The Retail Assets shall be deemed to be included in the definition of Excluded Assets (as defined in Section 2.2 of the Purchase Agreement).

2.3     Accounts Receivable.

(a)     The definition of Accounts Receivable in the Purchase Agreement is hereby amended to read as follows:

"Accounts Receivable" means any and all amounts due and owing to the Seller arising out of the Seller's water system in Anderson County, South Carolina, as the term "accounts receivable" is understood under GAAP. The term "Accounts Receivable" shall include the value of all unbilled water service provided as of the relevant date of determination, regardless of whether such value would be considered accounts receivable under GAAP.

(b)     No Accounts Receivable shall be conveyed to the Purchaser and all such Accounts Receivable shall instead be included in the Excluded Assets.

2.4     Retention of Liabilities. The Purchaser shall not assume the Liabilities of the Seller reflected on the Interim Schedule of Assets and Liabilities or the Liabilities of the Seller arising out of the operation of the Business in the ordinary course after the date of the Interim Schedule of Assets and Liabilities.

2.5     Purchase Price Adjustment. The Base Purchase Price shall not be adjusted by the current assets or current liabilities of the Business and shall instead only be adjusted by adding to the Base Purchase Price the Capital Expenditures shown on the Capital Expenditures Schedule. The "Purchase Price Adjustment" shall refer to the increase to the Base Purchase Price for such Capital Expenditures.

2.6     Post-Closing Adjustment. No Closing Schedule of Assets and Liabilities shall be prepared. The Purchaser shall have forty-five days after the Closing Date to audit the Capital Expenditures Schedule in accordance with Section 3.6(a) of the

08.25.12 City 000129

5000171

## EXHIBIT A

### RETAIL ASSETS

The Retail Assets consist of the following:

(a)    All water mains and pipes used in the Seller's water system in Anderson County, South Carolina that are (i) owned by the Seller or in which the Seller has an ownership interest and (ii) located within the area described on Schedule 1 attached hereto, but excluding the water mains and pipes described on Schedule 2 attached hereto (the water mains and pipes that are included in the Retail Assets are referred to herein as the "Retail Mains and Pipes");

(b)    All recorded and unrecorded water distribution and water transmission easements, rights of way and rights of encroachment to the extent the same contain (but only to the extent the same contain) Retail Mains and Pipes and are: (i) owned by the Seller or in which the Seller has an ownership interest; (ii) located within the area described on Schedule 1 attached hereto; and (iii) used by the Seller in connection with the Retail Mains and Pipes;

(c)    All fire hydrants, meters and valves that are (i) owned by the Seller or in which the Seller has an ownership interest and (ii) connected to and served by the Retail Mains and Pipes;

(d)    The fixed assets listed on Schedule 3 attached hereto;

(e)    The Real Property (including the improvements thereon) listed on Schedule 4 attached hereto;

(f)    All of the Seller's rights under all Contracts relating exclusively to the Retail System, including those Contracts listed on Schedule 5 attached hereto, other than any rights arising as a result of the breach of any such Contracts prior to the Closing Date and other than any Excluded Contracts;

(g)    All of the Seller's books, files, records, documents, data, plans, proposals and all other recorded knowledge, whether in written, electronic, visual or other form, related exclusively to the Retail Business; and

(h)    All Accounts Receivable, except for Accounts Receivable owing by Upstate Heater Utilities, Inc and the following customers of the Seller's water system in Anderson County, South Carolina· Big Creek Water and Sewage District, Broadway Water and Sewage District, Hammond Water District, Powdersville Water District, Sandy Springs Water District, Star-Iva Water and Sewer District, West Anderson Water District, City of Clemson, Clemson University, Homeland Park Water and Sewage District, Town of Williamston and Town of Pendleton.

CHAR1\856501 03227.01002

08.25.12 City 000137

5000179

Schedule 1
to
Exhibit A

Description and Geographic Area of Retail Mains and Pipes

The retail mains and pipes are located within the retail service area shown in gray on the attached map and as described below:

Service Area Boundary Description: Beginning where U.S. Highway 76 & S.C. Highway 28 crosses Lake Hartwell, thence eastwardly approximately four tenths of a mile along the Six and Twenty Arm of Lake Hartwell to the eastern property line of Middleton Shores S/D, thence southwardly along said property line to Old Mill Road, thence southeastwardly along Old Mill Road and extending one lot deep on the southern side of Old Mill Road until its intersection with U.S. 178, crossing Brown Road and continuing to Fritz Drive, thence northeastwardly along Fritz Drive approximately three tenths of a mile, then due east approximately three tenths of a mile to a ditch, thence northwardly along said ditch approximately three tenths of a mile to a tributary of Town Creek, thence southeastwardly along said tributary approximately four tenths of a mile to a point being common with the Anderson City Limits, thence northeastwardly approximately four tenths of a mile to the intersection of Kings Road and Hobson Road, thence southeastwardly along Hobson Road approximately six tenths of a mile to the property line of Peppertree S/D, thence southwestwardly, southeastwardly, and northeastwardly, all along the boundary of Peppertree S/D and back to Hobson Road, thence continuing southeastwardly along Hobson Road approximately two tenths of a mile to Concord Road, thence northeastwardly along Concord Road to Edgebrook Drive, thence southeastwardly along Edgebrook Drive approximately seven tenths of a mile, thence due south approximately four tenths of a mile to the curve in Cardinal Circle, thence along Cardinal Circle to the property line of Maredon Place S/D, thence along the property line boundaries of Maredon Place S/D in westerly, northwesterly, southwesterly and southeasterly directions to the western most property line of Cardinal Park, and thence along western most Cardinal Park property line to Reed Road, thence eastwardly along Reed Road to S.C. Highway 81, thence southwardly along S.C. Highway 81 approximately one fourth of a mile to Simpson Road, thence along the property line boundary of the Bi-Lo Shopping Center in southwesterly, southeasterly and northeasterly directions back to Simpson Road approximately two tenths of a mile from S.C. Highway 81, thence southeastwardly along Simpson Road to Calhoun Street Extension, thence southwestwardly along Calhoun Street Extension approximately four tenths of a mile to a branch of Bailey Creek, thence southeastwardly along the branch through Rankins Lake to Bailey Creek, thence southwesterly along Bailey Creek to Rogers Road, thence eastwardly along Rogers Road to Old Williamston Road, thence southwestwardly along Old Williamston Road approximately three tenths of a mile to Highland Acres S/D, thence approximately one mile along the western property line of Highland Acres S/D crossing Rocky River *(ending common boundary with Hammond and beginning with Broadway)* and along the northeastern property line of Cedar Ridge S/D to U S Highway 29, thence northeastwardly along U.S. Highway 29 to Plantation Road, thence southwardly along Plantation Road to Bellhaven Road, thence eastwardly along

08.25.12 City 000139

5000181

Bellhaven Road to Cypress Lane, thence southwardly along Cypress Lane to Bolt Drive, thence northwestwardly along Bolt Drive back to Plantation Road and including Forest Hill Chapel, thence southwardly along Plantation Road to Sansbury Drive, thence northwestwardly along Sansbury Drive to Fairfield Drive, thence southwestwardly along Fairfield Drive to U.S. Highway 76 & 178, thence northwestwardly approximately three tenths of a mile along U.S. Highway 76 & 178 to the southernmost property boundary of Anderson Garden Apartments *(ending common boundary with Broadway and beginning with Homeland Park)*, thence southwestwardly along said property line to Rocky River, thence northwestwardly along Rocky River to a branch stream located behind New Silverbrook Cemetery, thence southwestwardly approximately six tenths of a mile along said branch to White Street Extension, thence northwestwardly along White Street Extension to Shockley Ferry Road, thence northeastwardly along Shockley Ferry Road approximately four tenths of a mile to Cemetery Road, thence northwestwardly along Cemetery Road approximately one tenth of a mile to the Piedmont Northern Railroad rights-of-way, thence southwestwardly along said railroad rights-of-way approximately eight tenths of a mile to S. McDuffie Street, thence northwestwardly along S. McDuffie Street to Pecan Drive, thence along Pecan Drive to S. Main Street, thence southwardly approximately three and six tenths miles along S. Main Street, Hunt Street, Hillman Drive, and then cross country to and including all of the Wellington Mill property and to and including all of the Owens Corning Fiber Plant property and then back to Major Road, thence northwestwardly along Major Road approximately one tenth of a mile to the intersection of S.C Highway 28 Bypass and S. Murray Avenue, thence northwestwardly along S.C. Highway 28 Bypass to Sayre Street, thence southwestwardly approximately two and one half miles along Sayre Street and U.S. Highway 29 down to and including the BASF Plant property and Michelin Plant property and then back to U.S. Highway 28 Bypass, thence northwestwardly approximately six tenths of a mile to Generostee Creek, thence southwestwardly approximately eight tenths of a mile to a branch of Generostee Creek *(ending common boundary with Homeland Park and beginning with West Anderson)*, thence northwestwardly along said branch to Monitor Drive, thence westwardly along Monitor Drive to Y'all Road, thence northwestwardly along Y'all Road to Dobbins Bridge Road, thence in a northeasterly direction along Dobbins Road on the southeastern side of Dobbins Bridge Road to the western most entrance of Greenbrier Subdivision thence in a westerly direction along the northside of Dobbins Bridge Road to Michelin Blvd, thence northeastwardly along Michelin Boulevard to Three Mile Creek, thence northeastwardly along Three Mile Creek to S.C. Highway 24, thence westwardly along S.C. Highway 24 to Warner Road, thence northwardly along Warner Road to Standridge Road, thence westwardly along Standridge Road to Fretwell S/D, thence northwestwardly, southwestwardly and southeastwardly all along the boundaries of said S/D back to Standridge Road, thence westwardly along Standridge Road to New Prospect Church Road, thence northwestwardly approximately three tenths of a mile to Five Mile Creek, thence northeastwardly along Five Mile Creek to Centerville Road, thence northwestwardly along Centerville Road crossing Whitehall Road to Gerrard Road, thence northerly along Gerrard Road to Dixon Road, thence northwestwardly along Dixon Road to Dunn Road, thence northerly along Dunn Road to Old Pearman Dairy Road and the Southern Railroad tracks and rights-of way, thence northerly along the Southern Railroad rights-of-way to Lake Hartwell, and thence northeastwardly along the Six and Twenty Arm of Lake Hartwell

5000182

back to where U.S. Highway 76 & S.C. Highway 28 crosses Lake Hartwell.

Because the map attached hereto which depicts the retail service area of the City of Anderson may not be drawn to scale, in the event of a discrepancy between such map and the description provided above, such description shall control the actual retail service area boundary.

C-7560 )0\01  0 1227 01092

08.25.12 City 000141

E000183



Schedule 5
to
Exhibit A

## Certain Contracts and Arrangements

### Water Service Agreements

1.  Memorandum of Agreement, dated April 4, 1967, by and between Duke Power Company and Dow Badische Company.

2.  Water Service Agreement, dated April 1, 1990, by and between Duke Power Company and Owens-Corning Fiberglas Corporation.

3.  Water Service Agreement, dated April 7, 1995, by and between Duke Power Company and Plastic Omnium Industries, Inc..

4.  Memorandum of Agreement, dated December 12, 1977, by and between Duke Power Company and Stuaffer Chemical Company.

5   Agreement, dated August 10, 1987, by and between Duke Power Company and Culp Woven Velvets, Inc.

6.  Water Service Agreement, dated July 3, 2000, by and between Duke Water Systems and Michelin North America, Inc.

### Other Contracts and Agreements

1   All outstanding commitments made to extend service exclusively related to the Retail Business and all existing and unexpired refund agreements exclusively related to the Retail Business entered into pursuant to the Duke Power Company Water Department Service Regulations, dated July 10, 1990, filed with the South Carolina Public Service Commission.

2.  Fire Protection Water Service Agreement, dated January 27, 1989, by Duke Power Company and Anderson Tie Station.[2]

---

[2] The rights and obligation of Anderson Tie Station are to remain with the Seller.

C Wester J 01217 01092

5000188

# EXHIBIT B

123456789          City of Anderson Atty.                          01:18:52 p.m.     09-06-2012        2 /42

Execution Copy

ASSET SALE AGREEMENT

by and between

DUKE ENERGY CORPORATION

and

THE CITY OF ANDERSON

Dated as of February 20, 2002

123456789        City of Anderson Atty,                                01:19:52 p.m.        09-06-2012            8 /42

## ASSET SALE AGREEMENT

THIS ASSET SALE AGREEMENT (this "Agreement"), dated as of the 20th day of February, 2002, is between Duke Energy Corporation, a North Carolina corporation (the "Seller"), and The City of Anderson, an incorporated city in the State of South Carolina (the "Buyer").

## BACKGROUND STATEMENT

Pursuant to that certain Asset Purchase Agreement dated as of February 14, 2000, by and between Anderson County Joint Municipal Water System (the "Joint System") (which assumed, with certain exceptions, the obligations thereunder of the members of the Joint System) and the Seller, as amended by the First Amendment to Asset Purchase Agreement dated as of August 1, 2001, and the Second Amendment to Asset Purchase Agreement, dated as of the date hereof (as the same may be further amended, modified, restated or supplemented from time to time, the "Joint System Agreement"), the Joint System agreed to purchase from the Seller, and the Seller agreed to sell to the Joint System, the Seller's water system in Anderson County, South Carolina, (the "Duke Water System") through a purchase and sale of substantially all of the system's assets. The system's assets include the assets that are described on **Exhibit A** attached hereto (the "Retail Assets"). The Buyer desires to purchase the Retail Assets directly from the Seller upon the terms and subject to the conditions contained herein, and the Joint System desires that the Seller sell the Retail Assets directly to the Buyer.

## STATEMENT OF AGREEMENT

In consideration of the mutual representations, warranties, covenants and agreements contained herein, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS

1.1    Capitalized Terms. As used in this Agreement, the following terms have the following meanings:

"Accounts Receivable" means any and all amounts due and owing to the Seller arising out of the Duke Water System, as the term "accounts receivable" is understood under GAAP, except for accounts receivable owing by Upstate Heater Utilities, Inc. and the following customers of the Duke Water System: Big Creek Water and Sewage District, Broadway Water and Sewage District, Hammond Water District, Powdersville Water District, Sandy Springs Water District, Starr-Iva Water and Sewer District, West Anderson Water District, City of Clemson, Clemson University, Homeland Park Water and Sewage District, Town of Williamston and Town of Pendleton. The term "Accounts Receivable" shall include the value of all unbilled

C-143333\09_00327 01092

**09.06.12 City 000007**

5000085

## ARTICLE II

## CONTEMPLATED TRANSACTIONS

2.1  Purchase of Retail Assets.  On the Closing Date, the Seller shall sell and deliver to the Buyer, and the Buyer shall purchase from the Seller, all of the Seller's right, title and interest in and to the Retail Assets.

2.2  Assumption of Liabilities.

(a)  Assumed Liabilities.  On the Closing Date, the Buyer shall assume, and thereafter timely pay and perform, the following obligations and liabilities of the Seller (the "Assumed Liabilities"):

(i)  the Liabilities arising out of the operation of the Retail Business from and after the Closing Date; and

(ii)  the obligations from and after the Closing Date under all of the Contracts other than the Excluded Contracts.

(b)  No Other Assumed Liabilities.  Except as set forth in Section 2.2(a) above or as otherwise expressly provided herein, the Buyer shall not assume or become liable for the payment or performance of any Liabilities of the Seller.

2.3  Procedures for Non-Transferable Assets.  If any Contracts included among the Retail Assets are not assignable or transferable either by virtue of the provisions thereof or under applicable law without the consent of some other party or parties, the Seller and the Buyer shall use commercially reasonable efforts to obtain such consents prior to the Closing Date.  If any such consents cannot be obtained, the parties intend that the Buyer nevertheless receive the economic benefits of, and perform the obligations under, such Contracts as if such Contracts have been assigned to the Buyer.  Accordingly, the Seller agrees to subcontract such Contracts to the Buyer at the price specified in each such Contract without any additional mark-up and on the same terms and conditions, and the Buyer shall be responsible for the costs associated with the performance of such Contracts and shall be entitled to and shall receive all the revenues from such Contracts.  If subcontracting any such Contract is not permitted, the Seller shall cooperate with the Buyer in any reasonable arrangement designed to give to the Buyer the benefits of and obligations under such Contract.

2.4  Real Property Rights.

(a)  In the special warranty deeds conveying the Real Property to the Buyer, the Seller shall reserve to itself appropriate rights of way and easements in the Real Property (i) for the purpose of operating and maintaining power distribution and transmission lines and other power distribution and transmission assets and for other purposes customarily contained in power utility easements and rights of way; and (ii) for access by the Seller to any of the Seller's real property that will be subdivided and retained by the Seller (the "Retained Real Property").

C-343331\09_0321^01092

7

5000091

(b)    In the special warranty deeds conveying the Real Property to the Buyer, the Seller shall grant to the Buyer appropriate rights of way and easements in the Retained Real Property (i) for the purpose of operating and maintaining the distribution system of the Retail Business and for other purposes customarily contained in water utility easements and rights of way and (ii) for access by the Buyer to the Real Property.

2.5    Leased Vehicles. If the Buyer desires to purchase any of the vehicles (the "Leased Vehicles") that the Seller leases as of or after the date hereof for use exclusively in the conduct of the Retail Business, the Buyer shall notify the Seller in writing which Leased Vehicles the Buyer wishes to purchase at least 20 days prior to the Closing Date. After receiving such notice, the Seller shall take the necessary steps to purchase the Leased Vehicles desired by the Buyer from their respective lessors pursuant to the purchase options contained in the leases for such Leased Vehicles; provided, that, the Seller shall not have any obligation to purchase any Leased Vehicle that the Seller does not lease as of the date the Seller receives the notice from the Buyer pursuant to this Section 2.5 and shall not have any obligation to purchase any Leased Vehicle that the Seller leases pursuant to a lease that does not contain a purchase option. After such purchase by the Seller, such Leased Vehicles shall be considered part of the Retail Assets and shall be conveyed to the Buyer as provided hereunder. In consideration of the purchase of the Leased Vehicles by the Seller for the benefit of the Buyer, the Buyer shall pay to the Seller on the Closing Date, in addition to all other amounts due to the Seller hereunder, the total amount of all costs and expenses, as provided by the Seller to the Buyer in writing prior to the Closing Date, of the Seller in purchasing the Leased Vehicles desired by the Buyer. Notwithstanding anything to the contrary contained herein or in any of the other Transaction Documents, the Buyer agrees that the representations and warranties contained in Article V hereof (except for those contained in Section 5.12 hereof) shall not apply to the Leased Vehicles included in the Retail Assets. Except for the representation and warranty contain in Section 5.12 hereof, SELLER MAKES NO EXPRESS WARRANTY OF ANY KIND WHATSOEVER WITH RESPECT TO ANY OF THE LEASED VEHICLES SOLD TO THE BUYER HEREUNDER AND EXPRESSLY DISCLAIMS ALL IMPLIED WARRANTIES, AT LAW OR IN EQUITY, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE WITH RESPECT TO SUCH LEASED VEHICLES.

## ARTICLE III

## PURCHASE PRICE AND EXPENSES

3.1    Purchase Price. In consideration of the transfer to the Buyer of the Retail Assets, on the Closing Date, the Buyer shall pay to the Seller the amount of Fifteen Million Five Hundred and Eighty Thousand Dollars ($15,580,000) (the "Base Purchase Price"), subject to any reduction in the Base Purchase Price elected by the Seller pursuant to Section 7.5 or 7.6, and plus an amount (such amount being referred to herein as the "Receivables Amount") equal to the sum of all Accounts Receivable as of the Closing Date (as so adjusted, the "Final Purchase Price").

C-743353v09_032770100C

8

5000092

City of Anderson Atty.                                           01:28:10 p.m.    09-06-2012    30 /42

reasonably be expected to impair materially, the Buyer's ability to perform its obligations under this Agreement; and

(b)    The Seller will promptly, and in no event later than three Business Days after obtaining knowledge thereof, give oral and written notice to the Buyer of (i) any material default or breach by the Seller with respect to any of the Seller's representations and warranties in this Agreement or the due and timely performance of any of the Seller's covenants and agreements contained in this Agreement, (ii) any matter that has resulted in, or might reasonably be expected to result in, a Material Adverse Effect, or (iii) any other matter that has impaired materially, or might reasonably be expected to impair materially, the Seller's ability to perform its obligations under this Agreement.

7.11    Post-Closing Access to the Assets.

(a)    The Buyer shall permit the Seller to have access to the Real Property for a reasonable period of time following the Closing for the purpose of allowing the Seller and the Joint System to remove any assets that do not constitute the Retail Assets.

(b)    The Seller shall be permitted to maintain its telecommunications equipment on the Owens Corning Fiberglass Tank located on Starr Highway in Anderson, South Carolina, for a period of one year after the Closing Date, at no cost to the Seller, and shall be permitted reasonable access to such telecommunications equipment. The Seller shall have the right to remove its telecommunications equipment from the Owens Corning Fiberglass Tank at any time during such one-year period. After the expiration of such one-year period, any telecommunications equipment not removed shall become the property of the owner of such tanks. The Seller agrees to (a) repair any damage to any property of the Buyer resulting from the Seller's operation, maintenance, repair, replacement or removal of such equipment, and (b) to indemnify and hold the Buyer harmless from any loss or liability for any damage to, or destruction of, property or any injury, death or other loss to persons resulting directly or indirectly from the acts or omissions of any officer, employee, agent, contractor or any other person acting on behalf of the Seller in connection with the Seller's operation, maintenance, repair, replacement or removal of such equipment.

7.12    Allocation of Purchase Price. The Seller and the Buyer shall use commercially reasonable efforts to agree on an allocation of the Final Purchase Price among the Retail Assets (with the remainder of the Final Purchase Price being allocated to goodwill). The Seller and the Buyer agree that they shall report the transactions contemplated by this Agreement for income tax purposes in accordance with the agreed upon allocation of the Final Purchase Price, pursuant to Section 1060 of the Code and the regulations thereunder, and agree not to take, in any filing with or accompanying any Tax Return reporting any part of the transaction undertaken herein, a position inconsistent with such allocations; provided, however, that if the Seller and the Buyer are unable to reach an agreement with respect to the allocation of the Final Purchase Price, each party may allocate the Final Purchase Price among the Retail Assets as it deems appropriate.

7.13    Assumption of Contracts. The Buyer shall use commercially reasonable efforts to cause each of the Seller's industrial customers that is a party to a water purchase agreement with the Seller to terminate its water purchase agreement effective on the Closing Date and to enter

C-1433b.v09_0327 01093

23 /luv

5000107

into a replacement purchase agreement directly with the Buyer. In addition, the Seller and the Buyer shall cooperate to obtain the release of the Seller with respect to all contracts to be assigned to the Buyer, and the assignment and assumption agreement to be entered into and delivered by the parties at the Closing shall provide that the Buyer (i) shall fully perform the Seller's obligations under the assigned contracts and (ii) shall, if a release of the Seller is not obtained, indemnify the Seller, to the extent permitted by law, for any breach by the Buyer of any such contracts.

7.14    Sale of Taps. The Buyer agrees that it will sell to the Joint System or its designees at the Closing or within 10 days thereafter all of the taps listed on Exhibit G at a price of $700.00 per tap.

7.15    Operating Agreement. At the Closing, the Buyer agrees to enter into an operating agreement with the Joint System in the form attached hereto as Exhibit H.

## ARTICLE VIII

## CLOSING CONDITIONS

8.1    Mutual Conditions. The respective obligations of each of the parties to this Agreement to effect the transactions contemplated hereby shall be subject to the fulfillment at or prior to the Closing Date of the following conditions:

(a)    Neither the Seller nor the Buyer shall be subject on the Closing Date to any order, decree or injunction of a court of competent jurisdiction that enjoins or prohibits the consummation of this Agreement and no Governmental Authority shall have instituted a suit or proceeding that is then pending that seeks to enjoin or prohibit the transactions contemplated hereby. If the Seller or the Buyer is subject to any such order, decree or injunction or the subject of any such suit or proceeding, then such Person shall take any steps within such Person's control to cause any such order, decree or injunction to be modified so as to permit the Closing and to cause any such suit or proceeding to be dismissed.

(b)    No federal, state, local or foreign, if any, law, statute, regulation, code, ordinance or decree shall have been adopted or promulgated; and no temporary restraining order, preliminary or permanent injunction or other order issued by a court or other Governmental Authority of competent jurisdiction shall be in effect, having the effect of making the transactions contemplated herein illegal or otherwise prohibiting consummation of the transactions contemplated herein; provided, however, that the provisions of this Section 8.1(b) shall not relieve the Seller or the Buyer of its obligations to effect the transactions contemplated by this Agreement if such party's or parties' failure to fulfill its obligations pursuant to Section 7.7 shall have been the cause of, or shall have resulted in, such order or injunction.

(c)    All approvals required for the transactions contemplated herein from Utilities Commissions and Health Agencies shall have been obtained.

C-743323v06_03227 01092

24 /bd/

09.06.12 City 000030

5000108

## EXHIBIT A

## RETAIL ASSETS

The Retail Assets consist of the following:

(a)    All water mains and pipes used in the Seller's water system in Anderson County, South Carolina that are (i) owned by the Seller or in which the Seller has an ownership interest and (ii) located within the area described on Schedule 1 attached hereto, but excluding the water mains and pipes described on Schedule 2 attached hereto (the water mains and pipes that are included in the Retail Assets are referred to herein as the "Retail Mains and Pipes");

(b)    All recorded and unrecorded water distribution and water transmission easements, rights of way and rights of encroachment to the extent the same contain (but only to the extent the same contain) Retail Mains and Pipes and are: (i) owned by the Seller or in which the Seller has an ownership interest; (ii) located within the area described on Schedule 1 attached hereto; and (iii) used by the Seller in connection with the Retail Mains and Pipes;

(c)    All fire hydrants, meters and valves that are (i) owned by the Seller or in which the Seller has an ownership interest and (ii) connected to and served by the Retail Mains and Pipes;

(d)    The fixed assets listed on Schedule 3 attached hereto;

(e)    The Real Property (including the improvements thereon) listed on Schedule 4 attached hereto;

(f)    All of the Seller's rights under all Contracts relating exclusively to the Retail System, including those Contracts listed on Schedule 5 attached hereto, other than any rights arising as a result of the breach of any such Contracts prior to the Closing Date and other than any Excluded Contracts;

(g)    All of the Seller's books, files, records, documents, data, plans, proposals and all other recorded knowledge, whether in written, electronic, visual or other form, related exclusively to the Retail Business; and

(h)    All Accounts Receivable.

The Retail Assets shall not include any other assets including (i) any water main or pipe associated with the Duke Water System to the extent the same is located outside of the geographic area described on Schedule 1 attached hereto; (ii) any land, building or structure, water storage tank or facility or associated pumping and related equipment not otherwise included above in the Retail Assets, including the Duke Water System water treatment plant and related assets; and (iii) any easement, right of way or other right appurtenant to or otherwise associated with any of the assets described in (i) and (ii) in this sentence.

C-746238v04_ 03227.01092

**09.06.12 City 000042**

5000120

Schedule 1
to
Exhibit A

## Description and Geographic Area of Retail Mains and Pipes

The retail mains and pipes are located within the retail service area shown in gray on the attached map and as described below:

Service Area Boundary Description: Beginning where U.S. Highway 76 & S.C. Highway 28 crosses Lake Hartwell, thence eastwardly approximately four tenths of a mile along the Six and Twenty Arm of Lake Hartwell to the eastern property line of Middleton Shores S/D, thence southwardly along said property line to Old Mill Road, thence southeastwardly along Old Mill Road and extending one lot deep·on the southern side of Old Mill Road until its intersection with U.S. 178, crossing Brown Road and continuing to Fritz Drive, thence northeastwardly along Fritz Drive approximately three tenths of a mile, then due east approximately three tenths of a mile to a ditch, thence northwardly along said ditch approximately three tenths of a mile to a tributary of Town Creek, thence southeastwardly along·said tributary approximately·four tenths of a mile to a point being common with the Anderson City Limits, thence northeastwardly approximately four tenths of a mile to the intersection of Kings Road and Hobson Road, thence southeastwardly along Hobson Road approximately six tenths of a mile to the property·line of Peppertree S/D, thence southwestwardly, southeastwardly, and northeastwardly, all along the boundary of Peppertree S/D and back to Hobson Road, thence continuing southeastwardly along Hobson Road approximately two tenths of a mile to Concord Road, thence northeastwardly along Concord Road to Edgebrook Drive, thence southeastwardly along Edgebrook Drive approximately seven tenths of a mile, thence due south approximately four tenths of a mile · to the curve in Cardinal Circle, thence along Cardinal Circle to the property line of Marcdon Place S/D, thence along the property line boundaries of Marcdon Place S/D in westerly, northwesterly, southwesterly and southeasterly directions to ·the western most property line of Cardinal Park, and thence along western most Cardinal Park property line to Reed Road, thence eastwardly along Reed Road to S.C. Highway 81, thence southwardly along S.C. Highway 81 approximately one fourth of a mile to Simpson Road, thence along the property line boundary of the Bi-Lo Shopping Center in southwesterly, southeasterly and northeasterly directions back to Simpson Road approximately two tenths of a mile from S.C. Highway 81, thence southeastwardly along Simpson Road to Calhoun Street Extension, thence southwestwardly along Calhoun Street Extension approximately four tenths of a mile to a branch of Bailey Creek, thence southeastwardly along the branch through Rankins Lake to Bailey Creek, thence southwesterly along Bailey Creek to Rogers Road, thence. eastwardly along Rogers Road to Old Williamston Road, thence southwestwardly along Old Williamston Road approximately three tenths of a mile to Highland Acres S/D, thence approximately one mile along the western property line of Highland Acres S/D crossing Rocky River *(ending common boundary with Hammond and beginning with Broadway)* and along the northeastern property line of Cedar Ridge S/D to U.S. Highway 29, thence northeastwardly along U.S. Highway 29 to Plantation Road, thence southwardly along Plantation Road to Bellhaven Road, thence eastwardly along

5000121

Bellhaven Road to Cypress Lane, thence southwardly along Cypress Lane to Bolt Drive, thence northwestwardly along Bolt Drive back to Plantation Road and including Forest Hill Chapel, thence southwardly along Plantation Road to Sansbury Drive, thence northwestwardly along Sansbury Drive to Fairfield Drive, thence southwestwardly along Fairfield Drive to U.S. Highway 76 & 178, thence northwestwardly approximately three tenths of a mile along U.S. Highway 76 & 178 to the southernmost property boundary of Anderson Garden Apartments *(ending common boundary with Broadway and beginning with Homeland Park)*, thence southwestwardly along said property line to Rocky River, thence northwestwardly along Rocky River to a branch stream located behind New Silverbrook Cemetery, thence southwestwardly approximately six tenths of a mile along said branch to White Street Extension, thence northwestwardly along White Street Extension to Shockley Ferry Road, thence northeastwardly along Shockley Ferry Road approximately four tenths of a mile to Cemetery Road, thence northwestwardly along Cemetery Road approximately one tenth of a mile to the Piedmont Northern Railroad rights-of-way, thence southwestwardly along said railroad rights-of-way approximately eight tenths of a mile to S. McDuffie Street, thence northwestwardly along S. McDuffie Street to Pecan Drive, thence along Pecan Drive to S. Main Street, thence southwardly approximately three and six tenths miles along S. Main Street, Hunt Street, Hillman Drive, and then cross country to and including all of the Wellington Mill property and to and including all of the Owens Corning Fiber Plant property and then back to Major Road, thence northwestwardly along Major Road approximately one tenth of a mile to the intersection of S.C Highway 28 Bypass and S. Murray Avenue, thence northwestwardly along S.C. Highway 28 Bypass to Sayre Street, thence southwestwardly approximately two and one half miles along Sayre Street and U.S. Highway 29 down to and including the BASF Plant property and Michelin Plant property and then back to U.S. Highway 28 Bypass, thence northwestwardly approximately six tenths of a mile to Generostee Creek, thence southwestwardly approximately eight tenths of a mile to a branch of Generostee Creek *(ending common boundary with Homeland Park and beginning with West Anderson)*, thence northwestwardly along said branch to Monitor Drive, thence westwardly along Monitor Drive to Y'all Road, thence northwestwardly along Y'all Road to Dobbins Bridge Road, thence in a northeasterly direction along Dobbins Road on the southeastern side of Dobbins Bridge Road to the western most entrance of Greenbrier Subdivision thence in a westerly direction along the northside of Dobbins Bridge Road to Michelin Blvd., thence northeastwardly along Michelin Boulevard to Three Mile Creek, thence northeastwardly along Three Mile Creek to S.C. Highway 24, thence westwardly along S.C. Highway 24 to Warner Road, thence northwardly along Warner Road to Standridge Road, thence westwardly along Standridge Road to Fretwell S/D, thence northwestwardly, southwestwardly and southeastwardly all along the boundaries of said S/D back to Standridge Road, thence westwardly along Standridge Road to New Prospect Church Road, thence northwestwardly approximately three tenths of a mile to Five Mile Creek, thence northeastwardly along Five Mile Creek to Centerville Road, thence northwestwardly along Centerville Road crossing Whitehall Road to Gerrard Road, thence northerly along Gerrard Road to Dixon Road, thence northwestwardly along Dixon Road to Dunn Road, thence northerly along Dunn Road to Old Pearman Dairy Road and the Southern Railroad tracks and rights-of way, thence northerly along the Southern Railroad rights-of-way to Lake Hartwell, and thence northeastwardly along the Six and Twenty Arm of Lake Hartwell

——123456789          City of Anderson Atty.                                              02:16:00 p.m.      09-06-2012          5 /51——

back to where U.S. Highway 76 & S.C. Highway 28 crosses Lake Hartwell.

Because the map attached hereto which depicts the retail service area of the City of
Anderson may not be drawn to scale, in the event of a discrepancy between such map and
the description provided above, such description shall control the actual retail service area
boundary.

C-746238v04_03227.01092

**09.06.12 City 000045**

5000123



### Schedule 2
### to
### Exhibit A

### Excluded Mains and Pipes

The following mains are excluded from the conveyance to the Buyer:

(a)    30" line from the Water Filtration Plant (located at 998 Hunters Trail, Anderson, South Carolina) to S.C. 28 Bypass along Old Pearman Dairy Road, Dixon Road and Whitehall Road.

(b)    24" line from the Water Filtration Plant to the vicinity of Lake Hartwell and Clemson Boulevard along Old Pearman Dairy Road, S.C. 28 Bypass and Clemson Boulevard.

(c)    16" line along S.C. 28 Bypass from the 30" line on Whitehall Road to the 24" line on Old Pearman Dairy Road.

C-746238v04_03227.01092

09.06.12 City 000046

5000124

## Schedule 5
## to
## Exhibit A

### Certain Contracts and Arrangements

#### Water Service Agreements

1. Memorandum of Agreement, dated April 4, 1967, by and between Duke Power Company and Dow Badische Company.

2. Water Service Agreement, dated April 1, 1990, by and between Duke Power Company and Owens-Corning Fiberglas Corporation.

3. Water Service Agreement, dated April 7, 1995, by and between Duke Power Company and Plastic Omnium Industries, Inc.

4. Memorandum of Agreement, dated December 12, 1977, by and between Duke Power Company and Stuaffer Chemical Company.

5. Agreement, dated August 10, 1987, by and between Duke Power Company and Culp Woven Velvets, Inc.

6. Water Service Agreement, dated July 3, 2000, by and between Duke Water Systems and Michelin North America, Inc.

#### Other Contracts and Agreements

1. All outstanding commitments made to extend service exclusively related to the Retail Business and all existing and unexpired refund agreements exclusively related to the Retail Business entered into pursuant to the Duke Power Company Water Department Service Regulations, dated July 10, 1990, filed with the South Carolina Public Service Commission.

2. Fire Protection Water Service Agreement, dated January 27, 1989, by Duke Power Company and Anderson Tie Station.[2]

---

[2] The rights and obligation of Anderson Tie Station are to remain with the Seller.

C-746238v04_ 03227.01092

09.06.12 City 000049

5000127

# EXHIBIT C

WATER SALE AND PURCHASE AGREEMENT

among the

ANDERSON COUNTY JOINT MUNICIPAL WATER SYSTEM

and

The Municipalities of Anderson, Clemson, Pendleton and Williamston

and the Special Purpose Districts of

The Big Creek Water and Sewerage District of Anderson County,
The Broadway Water and Sewerage District of Anderson County,
Hammond Water District, Homeland Park Water District,
Powdersville Water District, Sandy Springs Water District,
Starr-Iva Water and Sewer District, and West Anderson Water District

---

Dated as of March 21, 2002

---

5000217

This **WATER SALE AND PURCHASE AGREEMENT** made as of this 21st day of March, 2002, by and among the ANDERSON COUNTY JOINT MUNICIPAL WATER SYSTEM, South Carolina, a joint municipal water system (hereinafter referred to as "Seller"), and the municipalities of Anderson, Clemson, Pendleton and Williamston and the special purpose districts of The Big Creek Water and Sewerage District of Anderson County, The Broadway Water and Sewerage District of Anderson County, Hammond Water District, Homeland Park Water District, Powdersville Water District, Sandy Springs Water District, Starr-Iva Water and Sewer District, and West Anderson Water District (hereinafter referred to as the "Purchasers").

## BACKGROUND AND FINDINGS

Seller was organized under the provisions of Section 6-25-5 et seq., Code of Laws of South Carolina (1976), as amended, as a body politic and corporate for the purpose of planning, financing, developing, constructing, acquiring, improving, enlarging, selling, leasing, maintaining and operating water facilities within the service areas of its respective members. In furtherance of such purposes, Seller has determined to acquire the Duke Energy Water Filtration Plant situated on Lake Hartwell, certain transmission mains which transport treated water from this Plant to various areas in Anderson County and a small area in Pickens County and related facilities (the "Duke Facilities"). The Duke Facilities, together with certain water transmission facilities that the City of Anderson is purchasing from Duke Energy Corporation ("Duke Energy"), have been the potable water source for and have provided water, on a wholesale basis, to each of the municipalities of Clemson, Pendleton, and Williamston, South Carolina and to the public service districts of The Big Creek Water and Sewerage District of Anderson County, The Broadway Water and Sewerage District of Anderson County, Hammond Water District, Homeland Park Water District, Powdersville Water District,

1

5000220

Sandy Springs Water District, Starr-Iva Water and Sewer District, and West Anderson Water District. In addition, Duke Energy has also, on a retail basis, provided potable water within and without the corporate limits of the City of Anderson, to Clemson University and to certain other commercial, industrial and residential customers.

Seller has negotiated an agreement with Duke Energy whereby it will acquire the Duke Facilities and the City of Anderson has negotiated an agreement with Duke Energy whereby it will acquire certain transmission mains, storage tanks and related facilities. In order to insure its ability to serve certain of the Purchasers with potable water in accordance with the requirements of this Agreement, Seller entered into an Operating Agreement on February 25, 2002 (the "Operating Agreement") with the City of Anderson for the provision of the operation of certain transmission mains and related facilities which are being acquired by the City of Anderson. In order to serve Clemson University, Seller will enter into a separate agreement with Clemson University which will purchase water on a wholesale basis from Seller. Simultaneously with the transfer of the Duke Facilities to the Seller, the City of Anderson is acquiring the afore-mentioned transmission facilities from Duke Energy and the special purpose districts of The Broadway Water and Sewerage District of Anderson County and West Anderson Water District are acquiring certain facilities from Duke Energy.

It is presently intended by the parties hereto that the City of Anderson will serve (1) two industries, BASF and Owens-Corning, located within the boundaries of Starr-Iva Water and Sewer District; and (2) the industrial facilities of Michelin, which are located within the boundaries of West Anderson Water District. Both Starr-Iva Water and Sewer District and West Anderson Water District consent to the City of Anderson's providing such service to these industries. However, such

2

5000221

consent is strictly limited to the provision of service to these named industrial customers and no further provision of service by the City of Anderson shall be made to any customer located within the boundaries of Starr-Iva Water and Sewer District or within West Anderson Water District without the written consent of such Purchaser.

The purpose of this acquisition is to assure that the provision of water to the service area will be under local control; that the water rates will be reasonable to local users; that an adequate water supply will be available for future growth in Anderson County; and that the associated local distribution systems may have an opportunity to make recommendations for future policies and operations. Seller, in order to acquire the Duke Facilities from Duke Energy, must obtain financing for the costs of the acquisition, related advances, and costs of issuance by the issuance of long term revenue bonds, secured by the revenues of Seller's water system and by water purchase agreements from its primary users.

Each of the Purchasers has determined that it is in the best interests of its customers and residents located within its respective service area to participate in the acquisition by Seller of the Duke Facilities by becoming a member of Seller and to purchase certain rights to the use of the Duke Facilities. By joining together, economies of scale can be achieved and each Purchaser will be able to acquire a safe and secure source of potable water. Each Purchaser, recognizing the benefits to be gained by such joint action, has determined, pursuant to the provisions of this agreement, to purchase the right to receive a specified allocated capacity defined in terms of millions of gallons of potable water per day and to pay for such amount of potable water by assuming the responsibility for a corresponding amount of the debt service on bonds issued by Seller to defray the acquisition of the Duke Facilities. As a means of providing sufficient security to the holders of such bonds all

3

C000222

The place for mediation or arbitration shall be Anderson, South Carolina, unless the parties agree otherwise. Any judgment upon the award may be entered in any court having jurisdiction. To the extent the parties agree, the decision of the arbitrator shall be final and binding upon the parties.

(B)    Arbitration shall not be considered the sole or exclusive means of settling controversies which may arise under the terms and provisions of this Agreement, nor shall arbitration be considered a condition precedent to any action in a court of law or equity or proceedings before any governmental agency or regulatory body having jurisdiction thereof.

(End of Article V)

## ARTICLE VI

## MISCELLANEOUS

Section 6.01. Ownership of Facilities. The System shall at all times be the sole and absolute property of Seller.

Section 6.02. Territorial Boundaries. In order to successfully plan and finance additions to each Purchaser's System, and to avoid future disputes, the parties have agreed upon a Territorial Map of the territories of the parties to this Agreement in order to set out the areas each intends to serve. The Territorial Map is attached hereto as Exhibit D.

Section 6.03. Construction and Operation of Trans-Lines.

Nothing herein shall prohibit any party from constructing new Trans-Lines, or maintaining existing Trans-Lines, through another's territory to serve customers in its own territory. Consent to use the streets and public ways for rights of way purposes for wholesale lines and for Trans-Lines is expressly given one to the other, subject to the appropriate proceedings being adopted by the party providing the consent and compliance with engineering and traffic safety standards. The owner of

35

08.25.12 City 000040

E000254

